IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Philadelphia           :
                                  :
               v.                  :
                                  :
Lindley Tower Realty Co., L.P.,   :
Old Lindley Corporation, Philip C.  :
Pulley, SBG Management Services  :
PA, Inc., YRP-Yurt IV LLC, Pacific  :
Western Bank, and Paul Early     :
                                  :
Appeal of: Lindley Tower Realty   :
Co., L.P., Old Lindley Corporation,  :
Philip C. Pulley, and SBG Management  :   No. 1072 C.D. 2024
Services PA, Inc.               :   Submitted: October 8, 2024

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                   HONORABLE CHRISTINE FIZZANO CANNON, Judge (P.)
                   HONORABLE MATTHEW S. WOLF, Judge

OPINION
BY JUDGE FIZZANO CANNON               FILED: October 16, 2024

        Lindley Tower Realty Co., L.P. (LP); Old Lindley Corporation; Philip C. Pulley; and SBG Management Services PA, Inc. (collectively, Appellants) appeal from the August 8, 2024 Order (dated July 29, 2024) of the Court of Common Pleas of Philadelphia County (Trial Court), which granted a permanent injunction against Appellants and in favor of the City of Philadelphia (City) and authorized, among other things, the demolition of a structure on Appellants' property (Trial Court Order). The Trial Court Order arose from a Complaint filed against Appellants, Paul Early, and Pacific Western Bank[1] (Complaint) by the City on September 20,

---

[1] The Complaint indicates that Paul Early (Early) was an employee and/or agent of, or otherwise maintained a business relationship with, Appellants and was involved in another matter

2022. Upon review, we vacate the Trial Court Order, and remand for further proceedings on an expedited basis.

## I. Factual and Procedural Background

Appellants own or otherwise have an interest[2] in property located at 1220 Lindley Avenue in the City, which includes a seven-story apartment building with a predominantly brick façade (Building). On September 14, 2022, the Building, which was occupied at that time, suffered a partial façade collapse. That same day, the City inspected the Building and, on September 16, 2022, the City issued a Violation Notice and Order to Correct (Violation Notice) to LP ordering the timely correction of the noticed violations. The Violation Notice relayed several findings related to the Building's façade and deemed the property "Imminently Dangerous." *See* Original Record (O.R.) Item No. 118 (Hearing Exhibits) at City Exhibit A.

On September 20, 2022, the City filed the Complaint and an Emergency Motion for Preliminary Special Injunction (September Motion) in the Trial Court. The Complaint alleged that Appellants failed to maintain the Building "in

---

related to the subject property, and that Pacific Western Bank was the current assignee of the mortgage. *See* Original Record (O.R.) Item No. 1 (Complaint) ¶¶ 21-23, 29. A review of the Original Record reveals Appellants' averment that Early is the President of a separate entity known as the 2d Chance Initiative and was a sublessor of 15 units in the subject premises consisting of a seven-story apartment building. *See* O.R. Item No. 8 (Sept. 2022 Answer and New Matter) ¶ 21. On October 6, 2022, the City filed a Praecipe to Substitute Parties by Agreement to substitute PRP-YURT IV LLC for Pacific Western Bank as a Defendant. *See* O.R. Item No. 20 (Praecipe to Substitute).

[2] Lindley Tower Realty Co. L.P. (LP) is the owner of record. Old Lindley Corporation and Philip C. Pulley have interests in the ownership chain, and SBG Management Services, PA Inc. is the property management company for the subject premises. *See* Complaint ¶¶ 2-20.

2

accordance with the minimum standard set by Title 9[3] and with the Fire Code[] and the Property Maintenance Code ([PM Code]) of the Philadelphia Building Construction and Occupancy Code, Title 4 of the Philadelphia Code of General Ordinances (Code)."[4] Complaint ¶ 111. The Complaint sought an order compelling Appellants to abate the public nuisance at the Building and correct all violations of the Code, imposing statutory fines and fees as authorized under the Code, and imposing all abatement costs incurred by the City upon Appellants. *Id.* at Wherefore Clause. The Trial Court held a hearing on the September Motion, which was ultimately granted by agreement of the parties. The September 22, 2022 order (September 2022 Order) granting the request for preliminary injunction found that the Building was imminently dangerous, no longer habitable, and a danger to the health, safety, and welfare of the public. O.R. Item No. 18 (September 2022 Order). The September 2022 Order, in relevant part, directed Appellants to put in place certain safeguards to protect the passing public and instructed them to cause a Licensed Professional Structural Engineer to conduct a survey of the façade and provide a report to the Trial Court. *Id.* The Report was to include an engineer's assessment of the current condition of the Building's façade and a plan including the steps necessary to remove the imminently dangerous designation and to make the Building safe. *Id.*

---

[3] Title 9 of the Philadelphia Code is titled "Regulation of Businesses Trades and Professions" and includes several sections that relate to property maintenance and housing. Phila., Pa., Code Title 9 (2020).

[4] Phila., Pa., Code §§ 1-101 to 22-1409 (2020).

Appellants partially complied with the September 2022 Order[5] and hired the engineering firm O'Donnell & Naccarato (O&N) to conduct a façade assessment and prepare a report (O&N Report), which was completed on September 23, 2022. The O&N Report rated the condition of the Building's façade as "Extremely Poor," which indicated that the façade was deemed unsafe with potential collapse of portions; that temporary make-safe plans needed to be immediately implemented; that physical deficiencies, damage and deterioration were easily visible throughout the façade; and that the façade required extensive and immediate repairs. O&N Report. The O&N Report also classified the façade as "Unsafe" as defined by the PM Code § 315.[6] The O&N Report stressed that it was based on a "**limited, visual, non-invasive observation** of **only** the [B]uilding façades." O&N Report at 9 (emphasis in original).

On October 19, 2022, the City filed an Emergency Motion for Modification of the Preliminary Special Injunction Issued September 22, 2022 (October Motion). The Trial Court held a hearing on the October Motion, which was ultimately granted by stipulation of the parties. The October 24, 2022 Order (October 2022 Order) modified the September 2022 Order and, in relevant part, set forth a schedule for Appellants to obtain and begin work under a make-safe permit for partial demolition of the façade. O.R. Item No. 31 (October 2022 Order). The

---

[5] The O'Donnell & Naccarato report (O&N Report) indicated that the the engineering firm was hired prior to the September 2022 Order. The O&N Report indicated that investigation of the Building's exterior was performed on September 16, 21, and 22, 2022. O.R. Item No. 119 (Trial Hearing Exhibits) at Exhibit D (O&N Report) at 3.

[6] The Philadelphia Property Maintenance Code, also referred to as Subcode "PM," is located within Title 4 (The Philadelphia Building Construction and Occupancy Code) of the Code. *See* PHILA., PA., CODE tit. 4, ch. 4-200.0 (2020).

October 2022 Order instructed Appellants that work under an issued permit must be commenced no later than February 1, 2023. *Id.*

Appellants failed to comply with the October 2022 Order to begin work to make the Building safe or demolish it before February 1, 2023, and on July 23, 2024, the City filed an Emergency Motion for Permanent Injunction and Order to Vacate and Demolish (July 2024 Motion). O.R. Item No. 110 (July 2024 Motion). The Trial Court conducted a hearing on the July 2024 Motion on July 26, 2024, and July 29, 2024. At the hearing, the City presented copies of a Violation Notice and Order to Correct[7] regarding the Building, a copy of the O&N Report, and photographs taken around the exterior of the Building from the time period between September 14, 2022, and July 25, 2024. The City also offered the testimony of two Department of Licensing & Inspections (L&I) officials related to the current condition of the Building.

Stephen Gallagher, Director of emergency services, inspections, and safety compliance for L&I[8] testified that, when he was last inside the Building in January of 2024, he observed water from an unknown source dripping down inside the first-floor stair tower on the northwest side of the Building. *See* Notes of Testimony (N.T.) 7/26/24 at 117-119. When questioned by the Trial Court about what type of repair work he would expect to see, Mr. Gallagher replied that he

---

[7] The City presented four separately mailed copies of a Violation Order and Notice to Correct with a Department of Licensing and Inspections (L&I) File Number: CF-2022-094607. The copies were sent to LP, at 1220 Lindley Ave, Philadelphia, Pennsylvania; 1095 Rydal Rd., Ste. 325, Rydal, Pennsylvania; 610 Old York Rd., Suite 375, Jenkintown, Pennsylvania; and 1623 Chelten Ave, Philadelphia, Pennsylvania 19126. Trial Hearing Exhibits at City Exhibit A.

[8] Mr. Gallagher was admitted as an expert and allowed to testify, over the objections of Appellants' counsel, to his opinion about whether the Building was in imminent danger of collapse and the impact a collapse would have on surrounding areas. *See* N.T. 7/26/24 at 139-143, 149-153.

expected to see "[r]emov[al of] the [B]uilding and damaged façade down to a safe level [and] remov[al of] loose bulging material from the façade," and indicated that he had not seen any such work performed. *See id.* at 132. Addressing the issue of whether the Building was in imminent danger of collapse, Mr. Gallagher stated:

> I base that on my visual observations of the [B]uilding and the information that was provided [to] me by a structural engineer that the steel structure had eroded apart and was not load-bearing and had separated. So[,] we were told it was in imminent danger of collapse by O'Donnell Naccarato.
>
> . . . .
>
> The opinion is that portion of the [B]uilding is in imminent danger of collapse until something has been done with it. Nothing has been done with it. It currently is being supported by a couple [of] bricks. And if someone knocks those bricks or takes those bricks out - -
>
> . . . .
>
> -- it will collapse. That was, again, told to me by a structural engineer.

*Id.* at 142-143. On cross-examination, Mr. Gallagher conceded that he had not been inside the Building to inspect since 2022, and that any inspection at that time was impeded because the walls were drywall and plaster, that his inspection of the exterior of the Building was a visual inspection, and that he relied on the O&N engineer for a closer inspection. *Id.* at 156-157. When questioned specifically about the O&N Report, Mr. Gallagher confirmed that the Report was a "limited visual noninvasive observation of only the [B]uilding façade." *Id.* at 165-166. When asked whether the City inspected the interior structure of the Building, Mr. Gallagher answered:

6

No, we did not look at the structural frame of the [B]uilding. We were only alerted to the section of the collapse where the steel had eroded and there was no physical connection to – and the engineer's recommendations in [the O&N Report].

*Id.* at 173.

During the hearing on the July 2024 Motion, the City also presented the testimony of Inspector James Slover from L&I's Contractual Services Unit. Mr. Slover testified that he has been to the Building several times over the past two years to do inspections and take pictures. Mr. Slover opined that further damage could have occurred because more water has entered the Building. N.T. 7/29/24 18-19. During his testimony, Mr. Slover acknowledge that his inspections of the Building were "[e]xterior inspections only, because the [B]uilding is fenced and closed off, stating [s]o what we do is walk around and make sure there's no more other sections of the [B]uilding that's collapsed." *Id.* at 22. During cross-examination it was established that Mr. Slover did not ask Appellants if he could do an interior inspection of the Building but that he was in the Building at one point when the City invited contractors for a demolition walk-through. *Id.* at 31.

Erik Villari, a structural engineer licensed as a professional engineer in the Commonwealth of Pennsylvania, testified at the hearing on behalf of Appellants. Mr. Villari testified that he did not believe it would be possible to determine whether the steel structure of a building is in imminent danger of collapse by doing only a visual inspection of the exterior because

> [t]he building façade works together with the building structure. The structure is what holds up the floors. It does support the weight of the walls, but the façade is not typically one of the primary load-carrying elements of the building.

7

> When they build a building, they build the steel frame, pour the concrete floors. It can stand there all by itself without any exterior walls. So in order to evaluate the structure, if we saw problems or signs, big bulges, we would recommend exploratory work. We would do it at the parts that look bad, we would do it at the parts that appear good, to determine if there is -- we would call it, like, a cancer throughout the structure.
>
> And there's just -- as of now, the only thing you can see is where the façade has collapsed. That's the only exposed structure.

*Id.* at 56. When asked whether he would agree with statements that an opinion could be given that the Building is in imminent danger of collapse based on an exterior visual inspection, Mr. Villari disagreed, noting that

> [y]ou're only seeing a certain snapshot of the [B]uilding structure seven floors up. You don't know-- the columns could be completely fine below there. They could also be bad below there. You don't know until you do some exploratory work.

*Id.* at 57.

The Trial Court found the testimony and evidence presented by the City at the hearing on the July 2024 Motion to be credible, Trial Court Order ¶ 24, and indicated, without explanation, that it found the testimony of Appellants' witnesses not credible. *Id.* ¶ 25. The trial court found the following facts regarding the property:

> 20. The [Building] remains imminently dangerous and presents a continuous dangerous condition because of the following:
>
> a. [Appellants] failed to take meaningful steps to complete any of the critical work identified in the O&N [R]eport that is necessary to make the subject premises safe;

8

b. The "[e]xtremely [p]oor" conditions identified in the O&N Report that create a risk of potential catastrophic collapse remain;

c. [Appellants'] failure to promptly remediate the conditions at the subject premises exposed the structure to additional seasonal freeze/thaw cycles that likely caused further deterioration of the already imminently dangerous conditions;

d. There is visible evidence of further deterioration, including expansion of existing bulge(s) in the masonry structure and deterioration in areas that are not immediately near the prior partial façade collapse;

e. Demolition of the [Building] at the subject premises is expected to take months;

f. Delay in commencing with the demolition would expose the structure to an additional freeze/thaw cycle that risks further deterioration of the already imminently dangerous conditions;

g. Delay in commencing with the demolition thus increases the risk of a potential catastrophic collapse;

h. [Appellants] continue to maintain, without credibility, that prompt action to correct the violations at the subject premises is not necessary to protect the public and prevent a potential catastrophic collapse;

i. [Appellants] lack the demonstrated financial ability to correct the violations at the subject premises in a timeline and manner necessary to protect the public and prevent a potential catastrophic collapse;

j. [Appellants] will not correct the violations at the subject premises in a timeline and manner necessary to protect the public and prevent a potential catastrophic collapse;

k. A catastrophic collapse would occur in close proximity to occupied residences; and

l. A catastrophic collapse would occur in close proximity to multiple churches, high-traffic commercial businesses, the Broad Street subway system's Logan Station and a health center.

21. The [Building] constitutes a public nuisance and remains a clear and immediate threat to the health, safety, and welfare of neighboring properties and the public.

22. No practical alternative to demolition exists to remedy that threat.

*Id.* ¶¶ 20-22.

The Trial Court then concluded that '[t]he City is entitled to permanent injunctive relief because it established all the elements necessary to support such relief and that demolition is needed to protect the health, safety, and welfare of the community." *Id.* ¶ 23. The Trial Court ordered the following relief:

1. The City . . . and/or its contractors are hereby authorized to enter the Subject Premises to abate the imminently dangerous conditions via demolition of the [Building].

2. [Appellants] and all known and unknown occupants shall vacate the Subject Premises.

3. If any person is found to be in the [B]uilding located at the Subject Premises, the Office of the Sheriff of Philadelphia and/or the Philadelphia Police Department is hereby directed to provide any such person with a copy of this Order. If any such person refuses to leave the [B]uilding immediately after receiving a copy of this Order, they are authorized, without the need for a writ of possession, to use whatever reasonable force is necessary to remove any such person.

4. After demolition of the [Building], [Appellants] shall thereafter maintain the Subject Premises in compliance with all applicable requirements of the . . . Code and other applicable law. After demolition, the City shall be permitted to inspect the Subject Premises to determine compliance with the . . . Code and applicable law.

5. Pursuant to Pennsylvania law, the Philadelphia Code, and the [L&I]'s Regulations, [LP] is a responsible party for the costs incurred by the City for any work performed directly or by contract to abate the violation of the . . . Code and remediate the imminently dangerous conditions of the Subject Premises, including but not limited to the costs related to the demolition, such as, *inter alia*, services of a professional engineer, demolition, sealing the lateral, stucco, asbestos removal, grading or ramping, and weatherproofing. In addition,

10

[Appellant] LP is responsible for a twenty-one percent (21%) administrative fee.

6. All costs associated with the demolition will be billed in the name of [Appellant] LP and if not paid in full within thirty (30) days may be entered as a lien against the Subject Premises. The City is authorized to enter all costs as a judgment against [Appellant] LP upon Praecipe to the Prothonotary.

Trial Court Order at Wherefore Clause ¶¶ 1-6.

On August 14, 2024, Appellants filed the Notice of Appeal in this Court challenging the Trial Court Order and, on September 6, 2024, filed an "Emergency Application for Stay of Demolition Order Pending Appeal" (Emergency Application) in this Court. The Court granted a temporary stay that same day pending oral argument on the Emergency Application. Thereafter, the City filed an Answer in opposition and Appellee PRP-Yurt IV, LLC filed an Answer indicating that it was not opposed to the request. Argument on the Emergency Application was held on September 19, 2024 and, on September 20, 2024, the Court granted the Emergency Application and directed expedited consideration on the merits of this appeal. *See* Memorandum and Order (9/20/2024).

## II. Discussion

### A. The Parties' Arguments

Appellants argue that the trial court erred in authorizing "the radical remedy of demolition" of Appellants' private property where the City failed to present concrete evidence that no "practical alternatives" to demolition exist. Appellants' Brief at 20 (citing *City of Phila. v. A Kensington Joint*, 301 A.3d 988, 999 (Pa. Cmwlth. 2023) *(quoting King v. Twp. of Leacock,* 552 A.2d 741, 744 (Pa. Cmwlth. 1989)). Specifically, Appellants aver that the City was required to establish that the "***only*** way to remediate the danger to the health, safety and welfare of the public is to destroy Appellants' [B]uilding – in an exercise of the police power, and at

11

Appellants' expense." Appellants' Brief at 25 (emphasis in original). While Appellants do not contest that the Building was deemed unsafe by Code inspectors, that it is currently unsuitable for habitation, or that they have failed to comply with the deadlines set forth in the October 2022 Order, they argue that the October 2022 Order authorized the City to make the repairs necessary to make the Building safe and to charge Appellants for all costs incurred. *Id.* at 26. Despite Mr. Slover's agreement that the repairs outlined in the O&N Report would be a practical alternative to taking the Building down, the City chose "to pursue demolition rather than less costly measures to eliminate the alleged imminent threat to public safety."[9] *Id.* at 28. Instead of authorizing demolition, Appellants contend that the Trial Court should have authorized the City to implement the remedial measures contained in the O&N Report that the City's witness, Mr. Slover, agreed would make the Building safe. *Id.* at 29-30.

Appellants further argue that the trial court improperly relied on the testimony of Code inspectors as to their opinions about the structural integrity of the Building, opining that the Building was in imminent danger of collapse and that demolition was the appropriate remedy. *Id.* at 22-23. Appellants assert that while Code inspectors Mr. Gallagher and Mr. Slover could be qualified as experts on matters concerning the Code, "their background does not provide the necessary expertise to opine about a building's structural integrity." *Id.* at 30 (citing *A Kensington Joint*, 301 A.3d at 1001-1002). Appellants argue that the condition of the Building is a matter outside Mr. Gallagher's and Mr. Slover's credentialed expertise, and that the Trial Court committed reversible error by relying on their testimony. Appellants' Brief at 30. Additionally, Appellants note that Mr. Slover did not establish during

---

[9] Appellants have not presented any cost analysis indicating the costs of the alternative work they believe the City may have undertaken in lieu of seeking demolition of the Building.

12

his testimony how he could determine that the Building was in imminent danger of collapse through a visual inspection of the exterior only. Appellants posit that while Mr. Slover indicated that he did not need to be an inspector to make that determination, he would need an inspector to tell him that the Building was safe. *Id.* at 31-32 (citing N.T., 7/29/24 at 14). Finally, Appellants discuss the testimony of their witness, Mr. Villari, a licensed professional engineer who testified that it would not be possible to opine about the structural integrity of the Building from a visual inspection of the exterior and noted that additional analysis would be needed.

In response, the City argues that the Trial Court's decision was based on substantial evidence that supports the finding that the Building is structurally unsound, that it constitutes a threat to public safety, and that there is no practical alternative to demolition. City Brief at 19. Primarily, the City argues that its police powers include the power to demolish a structure when necessary to protect the health, safety and welfare of the public. *Id.* at 21 (citing *Balent v. City of Wilkes-Barre,* 669 A.2d 309, 314 (Pa. 1995)). Additionally, the City asserts that it has statutory authority to demolish a structurally unsound building where necessary to abate the risk to the public. City Brief at 21 (citing Section 1 of the Act of June 15, 1961, P.L. 445, *as amended*, 53 P.S. §§ 14611, and Section 4 of the Act of May 16, 1923, P.L. 207, *as amended*, 53 P.S. § 7107; Phila. Home Rule Charter, Article V, Ch. 10, § 5-1002; Phila. Code § PM-110.4). The City contends that a building does not need to be on the brink of a complete collapse before demolition is an appropriate remedy. Rather, demolition is appropriate where it is the only practical option to abate "a danger to the health, safety, and welfare of the public." City Brief at 23 (*citing King*, 552 A.2d at 744).

In support of its argument that the Trial Court's decision was based on substantial evidence, the City points to the October 22, 2022 Order, to which Appellants stipulated, and which found that the conditions of the Building rendered it imminently dangerous and that measures that Appellants admitted were not undertaken were necessary to remedy those conditions. City Brief at 25 (citing October 2022 Order; N.T. 7/29/24 at 124). The City then referenced the testimony of Mr. Slover relating to the worsening condition of the Building. Specifically, the City highlighted testimony indicating that the unrepaired front façade of the Building had been exposed to rain and water runoff which could result in brick ties rusting, and that the Building was a danger to the public because bricks or steel beams could fall, hitting a person or property. City Brief at 26 (citing N.T. 7/29/24 at 9-10, 17-18, 25-26). The City argues that Mr. Slover's testimony is sufficient, and that this Court has previously affirmed demolition orders based on testimony from city code officials. *Id.* (citing *City of Phila. v. Urban Mkt. Dev, Inc.,* 48 A.3d 520, 523-24 (Pa. Cmwlth. 2012); *City of Erie v. Stelmack*, 780 A.2d 824, 826 (Pa. Cmwlth. 2001); and *City of Pittsburgh v. Kroznek*, 280 A.2d 488, 492 (Pa. Cmwlth. 1971)). While the City acknowledges that this Court, in *A Kensington Joint*, distinguished those cases and found that an engineer's report was needed to establish sufficient evidence of structural deterioration, it argues that such a report should not be needed under these circumstances. In particular, the City equates the instant situation to that in *Borough of Shenandoah v. Cruz* (Pa. Cmwlth., No. 715 C.D. 2016, filed May 22, 2017) (unreported), where the record supporting demolition included testimony that the building had "a hole in the roof the size of a Volkswagen," and argues that the evidence established by the partial collapse of the façade and the delay in repair are

14

sufficient. City Brief at 27-28. Additionally, the City argues that the O&N Report agreed with the observations of the Code inspectors. *Id.* at 28.

The City next argues that the Trial Court correctly concluded that there was substantial evidence showing that no practical alternative to demolition existed. The City emphasizes that Appellants failed to make repairs in the 22 months between the façade collapse and the hearing on the July 2024 Motion. Because of this, the City argues that "the record supports the [T]rial [C]ourt's finding that [Appellants] have proven incapable of restoring the Building to an acceptable condition with the expedience necessary to protect the public." *Id.* (citing *Urban Mkt. Dev.*, 48 A.3d at 523). In particular, the City highlighted testimony of Appellant Phillip C. Pulley confirming that Appellants had not done the required work, obtained the required permits, or fully secured the required financing for the project. City Brief at 30-31. The City argues that Appellants' demonstrated inability or unwillingness to make the necessary repairs to the Building makes demolition the only practical way to abate the public danger, despite a possibility that the Building could be repaired. Further, the City argues that it does not make sense to require the City to make repairs to the Building and then seek repayment.[10] The City asserts that Appellants were given the opportunity to elect whether to demolish or repair the Building and that their failure to do so in a timely manner authorizes the City to demolish the Building to abate the dangerous condition. *Id.* at 33.

---

[10] On the issue of repayment, the City first argues that any costs associated with the repairs of the Building not paid by Appellants would be passed on to taxpayers. It then addresses the uncertain ownership of LP and states it seeks to pierce the corporate veil to recover fines and costs. The City does not provide any evidence establishing what the costs of demolition are or whether the work required to abate the dangerous condition would cost less, as alleged by Appellants. City Brief at 32-33 n.9.

**B. Nature of Action; Scope and Standard of Review**

Generally, "[o]ur scope [and standard] of review in an equity action is limited to the determination of whether the [Trial Court's] findings of fact are supported by substantial evidence, whether an error of law has been made, or whether the [Trial Court] abused [its] discretion." *King*, 552 A.2d at 743. To establish the right to a permanent injunction, a party must show that "(1) the right to relief is clear; (2) the relief is necessary to prevent an injury which cannot be compensated by damages; and (3) greater injury will occur from refusing the injunction than from granting it." *A Kensington Joint, LLC*, 301 A.3d at 998 (quoting *First Phila. Preparatory Charter Sch. v. Dep't of Educ.,* 179 A.3d 128, 132 n.2 (Pa. Cmwlth. 2018)).

**C. Analysis**

This Court has previously observed that an order of demolition constitutes a taking pursuant to the police power without compensation. As such, it must be subject to strict scrutiny and undertaken only when necessary for the protection of the public health, welfare, and safety. *A Kensington Joint*, 301 A.3d at 998 (citing *King*, 552 A.2d at 744).

In *King*, this Court considered the question of whether the remedy of demolition was supported by the trial court's factual findings. *See King*, 552 A.2d at 744-45. After a hearing, the trial court entered an order directing the owners to demolish the building. *Id.* at 743. We observed that the trial court could have fashioned remedies less radical than demolition, including the municipality performing work at the owners' expense. *Id.* at 744. Ultimately, this Court concluded that the trial court's findings were insufficient where the owners had performed recent remedial work that the trial court did not consider and no specific factual finding was made that the structure was unsafe. *Id.*

16

The City argues that we should distinguish *King* because the building at issue there was being demolished for aesthetic reasons and many of the aesthetic issues had been remedied before the demolition hearing. While the building in *King* still required about $40,000 in repairs to make it habitable, it was vacant and there was no danger of collapse. Conversely, the City argues that the Trial Court in this instance had "copious evidence" to support its finding that the Building was a threat to public safety and "ample evidence" that there was no practical alternative to demolition. City Brief at 24.

The City largely relies on Mr. Slover's testimony as a Code inspector to support the remedy of demolition. Despite Appellants' challenges to Mr. Slover's expertise discussed above, the City states that "not only did Inspector Slover's expertise meet the legal standard for admissibility,[11] but his findings were also corroborated by the O&N Report." The City also points to testimony during the hearing on the July 2024 Motion that suggested worsening conditions and the risk cold weather could pose for the Building's structural integrity. The City emphasizes that Appellants had agreed that the Building was imminently dangerous when they stipulated to the October 2024 Order. No work has been done to abate that condition, so the City argues that Appellants should be precluded from attempting to argue that the Building is not imminently dangerous.

The Court concludes that the evidence in the record does not constitute substantial evidence to support the Trial Court's determination that the Building's structure has deteriorated to the point where it is in imminent danger of collapse.

---

[11] The legal standard for the admission of expert opinion in Pennsylvania is outlined in Pennsylvania Rules of Evidence, Rule 702, Pa.R.E. 702. While this Court agrees that he qualifies as an expert in Code inspection, the City has not provided further explanation why Mr. Slover is an expert in the technical field of structural engineering.

*See King*, 552 A.2d at 744 (finding it troubling that the trial court had not found that the building was in imminent danger of collapse). The Trial Court relied on the testimony of Mr. Gallagher and Mr. Slover and on the O&N Report to establish the structural integrity of the Building as of the date of the hearing. While the Court made references to the witnesses' expertise during the hearing, both witnesses were permitted to testify as to their opinions about the structural stability of the Building, an issue outside the scope of their professional fields. Additionally, although the O&N Report is an engineering report, the City attempts to reframe it as something that it is not. The O&N Report clearly states that it is based on a "**limited, visual, non-invasive observation** of **only** the [B]uilding façades[,]" but despite this, the City argues that the Report indicates that the Building, as a whole, is beyond its useful life. O&N Report at 9 (emphasis in original); *see also* City Brief at 19.[12] No interior inspections of the Building have ever been performed.[13] *See supra* at 6, 7 (testimony of Mr. Gallagher and Mr. Slover). On that basis, the Court distinguishes *Urban Market Development*, where this Court affirmed the trial court's demolition order relying on a violation notice that specified that "the floor/ceiling assembly, a wall, and the roof of the [p]roperty were all deteriorated and in danger of collapse,"

---

[12] The City cites the O&N Report for its contention that the Building is beyond its useful life. The Court observes that page three of the O&N Report states that a "review of the existing [B]uilding façade determined the exterior walls generally appeared to be in *Extremely Poor* condition[,]" and then refers readers to the "Attached Structural Classification Definitions" (Definitions) which follow the report. *See* O&N Report at 3 (emphasis in original). The Definitions refer generally to a structure that is beyond its useful life. *See id.* at Definitions. The City's characterization that the O&N Report states the Building is beyond its useful life is, at best, misleading.

[13] Appellants attached to their Emergency Application for Stay a copy of what purports to be the report of an engineer based on an extensive interior inspection of the Building. That inspection is, however, outside the record and does not exist for purposes of appellate review. *See B.K. v. Dep't of Pub. Welfare*, 36 A.3d 649, 657 (Pa. Cmwlth. 2012).

as well as testimony from a code inspector that "there was no interior floor system, the roof was compromised, and the [p]roperty was in extremely dangerous condition and represented significant danger to the public." *Urban Mkt. Dev.*, 48 A.3d at 523, 524. This conclusion appears to have followed an interior inspection of the property.

Likewise, the Court contrasts the instant matter with *Stelmack*, where this Court upheld a demolition order against a substantial evidence challenge. *See* 780 A.2d 824. In *Stelmack*, the city's fire code inspector testified to the fire code violations on the property and limited his testimony to his experience, stating that the property was "in an unsafe condition from a fire perspective[.]" *Id.* at 828. Additionally, unlike in the instant matter, evidence was apparently presented of an interior inspection that revealed debris and numerous code violations, as well as evidence that it would be cost prohibitive to bring the building back to a habitable condition. *Id.* at 825, 828. The City also cites to *Kronzek* for the premise that an inspector's testimony, photographs, and "knowledge of proper building standards" are sufficient to constitute substantial evidence. City Brief at 26-27 (citing *Kronzek,* 280 A.2d at 492). The *Kronzek* Court, however, does not specify what type of inspection was put into evidence. The dissent in *Kronzek* is nevertheless illustrative, indicating that there was an "entry on private property by government inspectors[.]" This characterization suggests that there was at least an up-close, if not a full, interior inspection of the properties. Finally, this Court distinguishes *Cruz,* where, in addition to establishing that there was "a hole in the roof the size of a Volkswagen," the trial court record also contained evidence that the sewer line had collapsed, resulting in raw sewage filling the property for nearly three years which had resulted in the odor of sewage and debris from the subject property encroaching upon neighboring properties.

This case is most like *A Kensington Joint*. While the facts are different and there is, notably, visible damage to the outside of the Building in this instance, the City here, like in *A Kensington Joint*, has not taken any action to assess the condition of the interior of the Building. Indeed, the City's witnesses represent that they relied on an engineering report specifying, as noted *supra*, that it was a "**limited, visual, non-invasive observation** of **only** the [B]uilding façades[,]" and their own inspections of the property which were comprised of observations of the Building from behind a safety fence. O&N Report at 9 (emphasis in original). While the City's witnesses did testify to generally worsening conditions due to exposure to the elements, there is no evidence that they endeavored to find out the current condition of the Building. Indeed, the witnesses relied heavily on the O&N Report which is now more than two years old. Additionally, aside from a brief visit in January 2024 and a recent walkthrough with demolition contractors noted above, the City presented little evidence that it has been inside the Building, let alone inspected it. Neither is there anything in the record to establish that alternatives to a full demolition of the Building were ever considered beyond permitting Appellants time to obtain the inspections and have the work done on their own. The record is devoid of any sort of cost analysis establishing the costs of demolition versus repair of the Building or any indication that the City has attempted to collaborate with Appellants or complete any work to make the Building safe and seek repayment from Appellants. The City argues that it does not make sense to require it to make repairs where uncertain repayment could result in costs being passed on to taxpayers. City Brief at 32. Demolition is also not without costs, however, and the City has indicated that it is seeking to pierce LP's corporate veil in order to recover the fines and costs to which it may be entitled.

20

### III. Conclusion

For the foregoing reasons, the Court concludes that the Trial Court erred in ordering demolition based on the existing record then before it in this matter. Accordingly, the Court vacates the Trial Court Order and remands for further proceedings on an expedited basis.[14]

_____
CHRISTINE FIZZANO CANNON, Judge

---

[14] The Court notes that nothing in our decision precludes the City from pursuing further remedies, including demolition, based on additional evidence presented to the Trial Court on remand.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| City of Philadelphia | : |
| | : |
| v. | : |
| | : |
| Lindley Tower Realty Co., L.P., | : |
| Old Lindley Corporation, Philip C. | : |
| Pulley, SBG Management Services | : |
| PA, Inc., YRP-Yurt IV LLC, Pacific | : |
| Western Bank, and Paul Early | : |
| | : |
| Appeal of: Lindley Tower Realty | : |
| Co., L.P., Old Lindley Corporation, | : |
| Philip C. Pulley, and SBG Management | :    No. 1072 C.D. 2024 |
| Services PA, Inc. | : |

## **O R D E R**

AND NOW, this 16th day of October, 2024, the August 8, 2024 Order (Trial Court Order) of the Court of Common Pleas of Philadelphia County (Trial Court) is hereby VACATED, and this matter is REMANDED to the Trial Court for further proceedings on an expedited basis, as follows:

1. Until final disposition of Philadelphia's (City) Complaint on remand or until otherwise ordered by the Trial Court, the City shall take all actions necessary to secure the property at 1220 Lindley Avenue in the City of Philadelphia (the Building) to mitigate danger to the public in the vicinity of the Building, including from the possibility of falling debris.

2. No persons shall be permitted to enter the Building except (1) counsel of record in this matter, Appellants, City personnel, and their agents, who shall be authorized to enter the Building solely for the purpose of obtaining any evidence necessary to pursue further relief before the Trial Court in this matter on remand, and (2) law enforcement

and emergency services personnel. The parties shall direct any motions regarding access to the Building to the Trial Court, which shall consider such motions on an expedited basis.

3. City personnel shall enter the Building and conduct an internal inspection.

4. The City may bill Appellants for any costs incurred for compliance with this Order.

5. The parties may file motions requesting further relief from the Trial Court, including requesting a hearing on permanent injunctive relief, which hearing the Trial Court shall conduct no later than two business days following praecipe for such hearing, and shall issue its decision within two business days after the conclusion of such hearing.

Jurisdiction Relinquished.


_____
CHRISTINE FIZZANO CANNON, Judge